# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 99-1804NE

———————

| | | |
|---|---|---|
| David L. Sokol, | * | |
| | * | |
| Appellant, | * | |
| | * | |
| v. | * | On Appeal from the United |
| | * | States District Court |
| Roger G. Kennedy, in his official | * | for the District of |
| capacity as Director of the National | * | Nebraska. |
| Park Service; Bruce Babbitt, in his | * | |
| official capacity as Secretary of the | * | |
| United States Department of the | * | |
| Interior; and United States of America, | * | |
| | * | |
| Appellees. | * | |

———————

Submitted:  December 16, 1999

Filed:  April 10, 2000

———————

Before RICHARD S. ARNOLD and LOKEN, Circuit Judges, and WEBB,[1] District
    Judge.

———————

RICHARD S. ARNOLD, Circuit Judge.

———————

[1] The Hon. Rodney S. Webb, Chief Judge, United States District Court for the
District of North Dakota, sitting by designation.

David Sokol, a landowner, appeals from a summary judgment upholding the boundaries for the Niobrara Scenic River area set by the National Park Service under the Wild and Scenic Rivers Act. The District Court held that the Park Service correctly chose which land adjacent to the Niobrara would be included within the protections of the Act. The Park Service, however, did not select the land on the basis of the "outstandingly remarkable values" standard required by the Act. We therefore reverse and remand.

I.

The Wild and Scenic Rivers Act, 16 U.S.C. §§ 1271 - 1287, protects selected free-flowing rivers that "with their immediate environments, possess outstandingly remarkable . . . values." 16 U.S.C. § 1271. In 1991, Congress amended the Act to designate a portion of Nebraska's Niobrara River as a protected Scenic River.[2] The amendment did not specify which or how much land in the immediate environment of the Niobrara River was ultimately to be included within the Act's protections.[3] Instead, it directed the Secretary of the Interior, pursuant to 16 U.S.C. § 1274(b), to select detailed boundaries for protected land in the Niobrara River area, totaling no more than 320 acres per river mile. The Secretary delegated this authority to the Park Service.

In 1992, the Park Service began the decision-making process to establish boundaries for the river area, and to generate the required General Management Plan and Environmental Impact Statement. This process was thorough and lengthy, lasting over four years. The Park Service formed a planning team, led by Natural Resource

---

[2] The Niobrara Scenic River Designation Act of 1991, Pub. L. No. 102-50, 105 Stat. 254, codified at 16 U.S.C. § 1274(a)(117).

[3] On designation, however, provisional boundaries were immediately set at one-quarter mile from the sides of the river banks. 16 U.S.C. § 1275(d). Provisional boundaries remain in place until amended by the action of the administering agency.

Specialist William Conrod, to gather and analyze information on the Niobrara River area from a wide variety of public and private sources. The planning team also developed its own information from personal observations and field studies of resources along the river. The planning team assembled a large amount of information that was used to create "resource maps." The team used these maps to develop boundary alternatives, seeking to maximize protection of various resources in the area. The Park Service also organized the Niobrara Scenic River Advisory Commission, a body of local residents, businessmen, environmental groups, and state officials, that contributed to the process and received public comment on the planned boundaries.

The Park Service did not evaluate the land adjacent to the Niobrara River in terms of "outstandingly remarkable" values. Instead, from the beginning, the planning team analyzed the Niobrara River area in terms of "significant" and "important" values. Park Service officials were more comfortable with the significance and importance standards because they were familiar with them from other regulatory contexts. Additionally, the planning team felt that the term, "outstandingly remarkable," was not clear and was relevant only to the selection of new rivers for inclusion in the Wild and Scenic Rivers System. Nevertheless, the planning team purported to adopt the outstandingly-remarkable-values standard retroactively after Mr. Sokol complained, at the September 15, 1995, meeting of the Advisory Commission, that the significant-values standard violated the Act. The planning team's documents and field notes before Mr. Sokol's complaint spoke only in terms of significance or importance. Subsequently, the draft and final boundary alternatives, published by the team in 1996, explained that "significant" and "important" were being used merely as synonyms for "outstandingly remarkable." By the end of the process, the Park Service claimed to have dropped the significant/important-values standard altogether, and the Park Service's final Record of Decision speaks only in terms of "outstandingly remarkable values."

In 1997, Mr. Sokol brought this suit in the District Court. He alleged that the Park Service had violated the Act by failing to apply an outstandingly-remarkable-values standard when selecting boundaries for the Niobrara Scenic River area. The defendants replied, first, that this standard did not apply because the Park Service had complete discretion under the Act to establish the boundaries as it saw fit. Second, they maintained that even if the outstandingly-remarkable-values standard was required, the Park Service had in fact used it. The District Court granted summary judgment for the defendants, upholding the decision of the Park Service. Mr. Sokol brought this appeal. We reverse and remand.

II.

Under the Administrative Procedure Act, we limit our review of the Park Service's administrative action to a determination of whether the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Park Service failed to apply the relevant statutory authority in making its decision. It selected land for inclusion in the Niobrara Scenic River area without identifying and seeking to protect outstandingly remarkable values, as required by the Wild and Scenic Rivers Act.

We reject the defendants' first argument that the Park Service was free to select land for the river area as it saw fit, without regard for the outstandingly remarkable values that Congress sought to protect in the Niobrara. The defendants rely on 16 U.S.C. § 1274(b), pursuant to which Congress charged the Park Service to establish detailed boundaries. They argue that Section 1274(b) allows them complete discretion in choosing land, within the Section's acreage limitation.[4] While it is true that Section

---

[4] "The agency charged with the administration of each component of the national wild and scenic rivers system . . . shall . . . establish detailed boundaries therefor (which boundaries shall include an average of not more than 320 acres of land per mile

1274(b) itself says nothing to the contrary, the defendants' argument completely ignores controlling language elsewhere in the Act.

Each river area in the Wild and Scenic River System must be "administered in such manner as to protect and enhance the values which caused it to be included" in the System. 16 U.S.C. § 1281(a). The values which cause a river area to be included in the System are the "outstandingly remarkable . . . values" of the river and of the related land adjacent to it.[5] Selecting detailed boundaries is an administrative act; it is an alteration of the river area already established by Congress.[6] As an administrative act, Section 1281(a) applied to the Park Service's selection of boundaries. Far from exercising complete discretion under that Section, the Park Service was required to make the boundary selection to protect and enhance the oustandingly remarkable values that caused the Niobrara River area to be included in the System.

Accordingly, we reject the defendants' contention that the Wild and Scenic Rivers Act provided no meaningful standard for the selection of detailed boundaries;

---

. . ..)" 16 U.S.C. § 1274(b).

[5] A river area may be "caused to be included" in the System, for the purposes of Section 1281(a), only if it contains "a free-flowing stream and related adjacent land area that possesses one or more of the values referred to in Section 1271 of this title." 16 U.S.C. § 1273(b). Section 1271 provides in turn: ". . . certain selected rivers of the Nation which, with their immediate environments, possess outstandingly remarkable scenic, recreational, geologic, fish and wildlife, historic, cultural, or other similar values, shall be preserved . . . [and] they and their immediate environments shall be protected. . . ." Thus, the "values" referred to in Section 1281(a) are the "outstandingly remarkable" values set out in Section 1271.

[6] Once a river area is included by Congress in the System, river-area boundaries are automatically established, on a provisional basis, one-quarter mile from the river's banks. 16 U.S.C. § 1275(d). An agency's selection of detailed boundaries does not bring the river area into existence; the river area exists before agency action.

this interpretation conflicts with the administrative duty clearly set out in Section 1281(a).[7] It also contradicts the Park Service's own prior interpretation of the Act.[8] The defendants argue correctly that the Park Service was not required to include only land with outstandingly remarkable values. The Park Service's statutory duty was to establish detailed boundaries, within the acreage limits of Section 1274(b), that would protect and enhance the outstandingly remarkable values that caused the river area to be included in the Wild and Scenic Rivers System. This duty does not always bar the administering agency from including unremarkable land; indeed, the Act could require such inclusion where necessary to protect outstandingly remarkable resources, e.g. because of the need for buffer zones around resources or because of discontinuities in a resource's locations. Equally, the Act does not require that the boundaries encompass all the outstandingly remarkable resources; this might be impossible given the acreage limitation. Neither categorical alternative is required by our decision. The Act allows the administering agency discretion to decide which boundaries would best protect and enhance the outstandingly remarkable values in the river area, but it must identify and seek to protect those values, and not some broader category.

We also reject the defendants' second argument -- that the Park Service did, in fact, identify and seek to protect the outstandingly remarkable values of the Niobrara River area. As the defendants admit, the planning team consistently analyzed resources in the Niobrara for their "significance" and "importance." These terms are not

---

[7] Such an open-ended and standardless interpretation of the Act would also leave defendants open to a claim of unconstitutional delegation of legislative power. We choose to construe the Act in such a way as to avoid any such constitutional question.

[8] See Memorandum of National Park Service Associate Director, Denis Glavin, J.A. at 1522. (Rejecting the bank-to-bank boundary alternative because it would be inconsistent with the Park Service's duty under the Act to protect outstandingly remarkable values in adjacent land.)

synonymous with "outstandingly remarkable." Significance and importance are much broader terms. They include far more than the "unique, rare, or exemplary" qualities that the defendants themselves have recognized are denoted by the outstandingly-remarkable-values standard. See Technical Report of the Interagency Wild and Scenic Rivers Coordinating Council, J.A. at 79. In any given group, many things can be significant or important. By definition, however, only a few things can be rare or exemplary, and only one can be unique.

The Park Service did not choose the terms "significance" and "importance" because they were synonyms for "outstandingly remarkable." These terms were derived from a separate legal standard used by Park Service officials to evaluate potential park lands,[9] a standard with which they were more familiar than the Wild and Scenic River Act's outstandingly-remarkable-values standard. J.A. at 48. The defendants now contend that while the terms of the park standard were used, the planning team meant "outstandingly remarkable" when it used them. But the team captain, who was responsible for interpreting the Act, stated that the team used significance and importance in the same sense that these terms were used to evaluate potential parks. J.A. at 61-62. Since no one suggests that the park standard is the same as the Act's standard, it is hard to understand the defendants' contention that all these terms have meant the same thing all along. Instead, we conclude that the Park Service simply used the wrong standard from the beginning.

---

[9] See, e.g., 16 U.S.C. § 1a-5(c)(3)(C) ("Each study . . . shall identify what alternative . . . would in the professional judgment of the Director of the National Park Service be most effective and efficient in protecting **significant** resources . . .."). It was a standard also familiar to Park Service officials from the preparation of Environmental Impact Statements. See 42 U.S.C. § 4332(C) (requiring a federal agency to prepare an EIS for "major Federal actions . . . **significantly** affecting the quality of the human environment . . ..") (emphasis added).

The values identified by the Park Service for protection likewise demonstrate that the planning team confused the standards appropriate for choosing potential parks and for selecting boundaries under the Wild and Scenic Rivers Act. In 1992, the planning team set out in "significance statements" the values it would seek to protect in selecting boundaries. In addition to using the significance standard to evaluate resources along the Niobrara, the team noted that the same "significance statements" should "be repeated again" when "included in the national park study." J.A. at 1342. The record provides no evidence that the planning team later corrected its confusion, or that it assigned a special meaning to the terms "significance" and "importance," equivalent to the statutory terms. Mr. Conrod, the team captain, admitted no such conscious decision had ever occurred. Indeed, Mr. Conrod went so far as to express what almost amounted to contempt for the terms of the statute.[10] Officials of the Executive Branch, like judges, are free to have their own private view of what Congress has said and done. But they are not free to put these views into practice. A statute is the command of the sovereign. The Park Service must follow it. Instead, Park Service officials applied the standard with which they were more familiar from other regulatory contexts, ignoring the outstandingly-remarkable-values standard required under the Wild and Scenic Rivers Act.

The defendants argue that whatever errors may have been made in the initial process were corrected in the draft and final boundary alternatives and in the Record of Decision. It is true that, after Mr. Sokol complained that the wrong standard was being used, editorial changes were made to the draft and final boundary alternatives. Specifically, a few sentences were added noting that "significant" and "important" were to be understood to mean outstandingly remarkable. These post hoc re-definitions,

_____

[10] "We don't walk around speaking in the terms Congress writes laws and that outstandingly remarkable . . . .There's nothing special or magic about those two words. It's just something that got put in an act of Congress, and probably by kind of a committee process, it's terrible prose, it obscures communication." J.A. at 50.

however, were not sufficient to correct past errors upon which the boundary alternatives and Record of Decision were based. Not surprisingly, the record shows that the re-definitions in the final year of the process did not affect the field resource evaluations made, years earlier, by the planning team under the wrong standard, or resource evaluations provided, years earlier, by third parties who were also given the wrong standard.

No attempts at re-analysis of information or judgments accompanied these re-definitions. After Mr. Sokol's complaints, the team changed a few sentences in the boundary alternatives but never reexamined its prior work in light of the new standard. Apparently, the planning team was never convinced that the outstandingly-remarkable-values standard was correct. Even after the Record of Decision had been published, Mr. Conrod stated that the outstandingly-remarkable-values standard did not apply to the selection of boundaries, but applied only initially "in the context of consideration of new sites." J.A. at 48. The Park Service analyzed the river area under the wrong standard, failing to use the outstandingly-remarkable-values standard required by the Act in selecting boundaries; it failed to correct its initial mistakes.[11] Therefore, we

---

[11] In addition to using the wrong standard, there is evidence in the record to suggest that the Park Service was not selecting land to protect the river area's resources but simply to maximize the number of acres included in the system. See, e.g., Draft Boundary Alternative Memorandum, Sept. 13, 1993, J.A. at 1387 (preferred boundary alternative includes "maximum statutory acreage," compared with others which include only "critical resources.") Particularly troubling was the decision to include more than 10,000 acres of "hypothetical" viewshed, land that a canoeist on the river would see if one assumed that there were no trees or foliage along the banks. This was a massively counterfactual assumption; the Park Service knew that 60 to 70 per cent. of the Niobrara River is screened by dense trees and foliage. J.A. at 2232. Much of the land included in this viewshed was ordinary, unstriking, and apparently unnecessary to protect the scenic values of the river. J.A. at 2231. The Park Service may include only land which possesses outstandingly remarkable resources or which is actually necessary to protect such resources.

reverse the decision of the District Court on this issue, and hold that the Park Service's boundary selection violated its statutory duty under the Act.

Mr. Sokol also argues that the Park Service failed to establish sufficiently detailed boundaries. Mr. Sokol argues that the Park Service was required, under 16 U.S.C. § 1274(b), to mark or post the boundaries physically along the river. This argument fails. The Act expressly provides that information concerning the location of the boundaries will be made available for public inspection on maps in the offices of the administering agency. 16 U.S.C. § 1274(c). Section 1274(b) makes no mention of physical posting, and its language is completely satisfied by the detailing of boundaries on maps, made available to the public. On this point, we agree with the District Court.

## III.

Accordingly, we reverse and remand to the District Court with instructions to remand to the Park Service. On remand, the Park Service should select boundaries that seek to protect and enhance the outstandingly remarkable values of the Niobrara Scenic River Area.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-10-